1
2
3
4
5
6

UNITED STATES DISTRICT COURT

7

NORTHERN DISTRICT OF CALIFORNIA

8
9

LYNNETTE FRARY, et al.,

Plaintiffs,

v.

COUNTY OF MARIN, et al.,

Defendants.

Case No.  12-cv-03928-MEJ

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; ORDER GRANTING PLAINTIFFS' MOTION TO FILE THIRD AMENDED COMPLAINT**

Re: Dkt. Nos. 97, 180

### INTRODUCTION

Plaintiffs sued the County of Marin and individual jail staff ("Defendants") for their alleged deliberate indifference to decedent Anthony Carmignani's serious medical needs while he was in Defendants' custody.  *See* Dkt. No. 52, Second Am. Compl.  Now pending before the Court is Defendants' Motion for Summary Judgment.  Dkt. No. 97 ("Mot.").  Plaintiffs oppose the motion.[1]  Dkt. No. 131 ("Opp'n").  The Court held a hearing on December 18, 2014.  Dkt. No. 171.  Having considered the parties' positions, relevant legal authority, and the record in this case, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for the reasons set forth below.

### BACKGROUND

The following facts are undisputed unless otherwise indicated:

---

[1] Plaintiff Heather Howard filed a joinder to Plaintiff Lynette Frary and Plaintiff Jamie Ball's Opposition.  *See* Dkt. No. 129.  There were no objections to this joinder.

United States District Court
Northern District of California

### A.      Decedent Anthony Carmignani

Marin County Jail staff found Anthony Carmignani not breathing in his cell on July 30, 2011.  Combined Statement of Facts[2] ("CSF"), Dkt. No. 137, ¶ 46.  Jail deputies and medical personnel tried to resuscitate Carmignani, and he was transported to the hospital, where he was later pronounced dead.  CSF ¶¶ 47-48.  His death certificate names his cause of death an accidental mixed drug overdose.  *Id.* ¶ 49.

The day before, on July 29, 2011, Novato Police Officers had arrested Anthony Carmignani and transported him to the Marin County Jail.  *Id.* ¶ 9.  Carmignani's mother, Plaintiff Lynnette Frary, reported Carmignani for allegedly stealing prescription medication from her home.  *Id.* ¶ 5.  Plaintiffs allege that during transit to the Jail, Carmignani retrieved some pills from his pockets and ingested them.  *Id.* ¶¶ 11, 12; Second Am. Compl. ¶¶ 9, 45, 47.  Carmignani arrived at the Jail at around 3:30 p.m.  CSF ¶ 13.

Upon arrival, Jail staff searched Carmignani and found several pills in his pockets, including one Embeda, an extended release morphine pill.  *Id.* ¶ 14.  Carmignani was then examined by a booking nurse, Defendant Shannon Fetterly, who asked him if he had taken any drugs.  *Id.* ¶ 16.  Carmignani told her that he had taken only two "street" morphine pills before he was arrested.  *Id.* ¶ 17.  Nurse Fetterly kept Carmignani in the booking area for four hours.  *Id.* ¶ 18.  During those four hours, she took his vital signs at least two times.  *Id.* ¶ 19.[3]

Nurse Fetterly testified that "[Carmignani's] vitals were fine. . . .  [H]e told me he was feeling fine" but also noted that "he was worried about withdrawal, when he started coming off of the medication, the morphine, that he was going to withdraw.  He made that very well-known to me."  Fiol Decl., Ex. 6 (Fetterly Dep.) 170:3-7, Dkt. No. 131-2.  She also testified that she wrote in his medical chart, "he just popped two morphine pills before he was arrested.  Noticed change

---

[2] The parties each submitted statements of undisputed facts, which Defendants combined in full at Dkt. No. 137.  For clarity, the Court refers to this document rather than the parties' individual statements and identifies disputed facts where necessary.

[3] Another Defendant Nurse, Susan Lesher, was responsible for reviewing Carmignani's medical chart and care plan at the Jail, but she never had any one-on-one interaction with Carmignani.  Giacomini Brewer Decl., Ex. E (Lesher Dep.) 19:25-20:3; 47:9-13; 48:6-18; 63:2-9, Dkt. No. 100-2; *see also* Fiol Decl., Ex. 11 (Lesher Dep.) 55:24-56:8, Dkt. No. 131-3.

in behavior, very drowsy, pupils pinpoint.  States he is going to detox bad."  *Id.* at 154:8-23.

Nurse Fetterly documented that Carmignani's eyes "went from non-pinpoint to pinpoint in that

hour and a half period" between 4:00 and 5:30 p.m. and that he became "very drowsy."  *Id.* at

139:3-18.  She found these observations significant at the time, noting that she was aware that he

was "definitely under the influence of something" and that these observations caused her to

believe "he needed to be observed in booking longer.  He was not ready to go upstairs."  *Id.* at

145:1-8.

A few hours later, around 8:00 p.m., Nurse Fetterly released Carmignani for placement

into the general jail population.  CSF ¶¶ 23, 29.  The jail staff placed Carmignani in

Administrative Segregation ("Ad Seg")—in a cell by himself—because his prior custodial history

indicated that he had gang affiliations as well as "keep away" orders from African Americans and

Hispanics.  *Id.* ¶ 29.  Carmignani's cell was equipped with an intercom.  *Id.* ¶ 30.  Nurse Fetterly

had advised Carmignani that he could use the intercom to get ahold of a nurse if he felt he needed

medical attention.  Fetterly Dep. 23:13-16, Dkt. No. 100-3, Ex. F.  Carmignani said that he

understood and that he just wanted to go to sleep.  *Id.* at 23:16-17; CSF ¶ 23.

Ad Seg has two levels, with Cells 1-7 on the lower level.  CSF ¶ 145; Fiol Decl., Ex. 10

(Johnson Dep.) 58:10-17; 71:1-2, Dkt. No. 131-3.  Carmignani was housed on the lower level, in

Cell 1.  CSF ¶ 162.  The Ad Seg Deputy sat in the "tower" that was even with the upper, second

level of cells.  *Id.* ¶ 146; Johnson Dep. 62:3-6.  The deputy must remain in the tower at all times.

Johnson Dep. 95:12-20.  There is also a movement relief deputy, or MRD, who moves in and out

of Ad Seg during the graveyard shift.  *Id.* at 95:21-96:21.  Deputy Johnson was the tower deputy

on July 29 and 30, 2011.  *Id.* at 77:12-18.  He placed Carmignani in Cell 1.  CSF ¶ 162.

The inmate status report listed Carmignani as "high risk" and "unstable[,]" noting also

"obs. opiate detox."  *See* Johnson Dep., Ex. 4; Fetterly Dep. 186:4-17; 187:1-11.  Nurse Fetterly

testified that she put in an entry "observe for opiate detox" and "[i]nformed custody about

morphine use prior to arrest."  Fetterly Dep. 154:14-15.  Additionally, a "corrections entry" states:

"17:43 hours: Nurse Shannon Fenley told me that while she was doing the inmates intake inmate

admitted to her that he had taken two street morphine pills prior to coming to jail.  He had pinpoint

United States District Court
Northern District of California

1    eyes.  Inmate stated that he will 'crash hard.'  Please monitor inmate."  Johnson Dep., Ex. 5

2    (spelling in original).

3         The Jail used an electronic log in its computer system known as the "Beat Book," which

4    deputies used to record "any notable event" that occurred in the Jail for each pod, including safety

5    checks. Dkt. No. 104, Hickey Decl. ¶ 4.  The Beat Book shows that the majority of the safety

6    checks for Carmignani were "completed from the tower" or "from tower."  Hickey Decl., Ex. A.

7    According to Deputy Johnson, a safety check completed from the tower means that he did a visual

8    or a sound check of the inmate.  Johnson Dep. 137:22-25; 89:4-12.  The pod deputy could only

9    hear sounds in the cell if he pressed a button to activate the intercom and connect the guard tower

10   to that cell; otherwise, the deputy cold not hear what was happening in the cell through the

11   intercom.  *Id.* at 65:12-21; 90:5-16.  Deputy Johnson testified that a visual check means peering

12   out the window of the tower.  *Id.* at 89:10-12.  He testified that he could see possibly a quarter of

13   Carmignani's cell-bed from the tower.  *Id.* at 77:13-18; 79:2-8; 84:5-8.  Ronald Martinelli,

14   Plaintiffs' expert witness, visited the jail, took pictures of the cell, and stated that no portion of the

15   bed could be viewed from the tower.  Martinelli Decl. ¶ 37[4] & Ex. 2, Dkt. No. 131-5.

16        At approximately 10:24 p.m., around seven hours after Carmignani arrived at the Jail,

17   Novato Police Officer Stephanie Commisto met with Carmignani to serve him with papers.  CSF ¶

18   31.  Carmignani walked to the door of his cell as Officer Commisto passed him the paperwork

19   through his cell's food port.  *Id.* ¶ 32.  Carmignani did not face Officer Commisto as he read the

20   papers, and she never saw his eyes.  *Id.* ¶ 34; Giacomini Brewer Decl., Ex. H (Commisto Dep.)

21   120:17-22; 122:20-25; Dkt. No. 101-2.  Officer Commisto did not observe anything about

22   Carmignani that indicated he was having problems or in any medical distress.  CSF ¶ 35.  Officer

23   Commisto's visit with Carmignani was not indicated in a "Beat Book" entry.  *See* Hickey Decl.,

24   Ex. A.

25   _____

26   [4] Defendants objected to Martinelli's Declaration, including this paragraph, generally arguing that
     the declaration is based on speculation, statements without foundation, improper legal conclusions
27   or opinions, and argumentative statements.  This paragraph, however, is based on Martinelli's
     personal observations from his July 10, 2014 site visit.  Nothing suggests that his observations in
28   this paragraph would be inadmissible testimony; Defendants' objections to this paragraph are thus
     **OVERRULED**.  Defendants did not object to the photographs in Exhibit 2.

1      The next morning, at approximately 5:30 a.m., Defendant Deputy Rachel Hammer and two

2  volunteer inmates attempted to serve Carmignani breakfast.  CSF ¶ 39.  Deputy Hammer asked

3  Carmignani if he wanted breakfast, but he did not respond.  Fiol Decl., Ex. 7 (Hammer Dep.)

4  121:23-122:2, Dkt. No. 131-2.  Deputy Hammer knocked on his cell door at least three or four

5  times and characterized these knocks as "hard."  CSF ¶¶ 40, 218; Hammer Dep. 122:3-21.  The

6  knocks elicited no response from Carmignani other than snoring.  Hammer Dep. 122:22-24.

7  Deputy Hammer testified that she elevated her voice to get Carmignani's attention, and even when

8  she yelled he did not respond.  *Id.* at 145:22-146:4.  Deputy Hammer also observed Carmignani's

9  chest rising and falling.  CSF ¶ 42.  His eyes stayed closed and she did not otherwise observe him

10  move.  Hammer Dep. 120:25-121:20.  Trustee Diaz, one of the volunteer inmates who helped

11  Deputy Hammer serve breakfast, testified that Anthony's mouth was open and his eyes slightly

12  open and rolled back.  Fiol Decl., Ex. 4 (Diaz Dep.) 69:20-70:12, Dkt. No. 131-2.

13      Deputy Hammer was read a statement by Trustee Diaz, which said that Deputy Hammer

14  had called out to Carmignani for approximately one minute and that he remembered commenting

15  to Deputy Hammer that Carmignani "looks dead."  Hammer Dep. 134:24-135:9.  Deputy Hammer

16  did not dispute the accuracy of this statement, instead stating that she does not remember.  *Id.* at

17  135:15-20.  Deputy Hammer reported to Deputy Johnson over her radio that Carmignani had

18  "refused" breakfast.  *Id.* at 124:14-21; CSF ¶ 222.  Deputy Hammer instructed the volunteer

19  inmates to remove the food tray.  Diaz Dep. 73:11-13.

20      At 8:40 a.m., jail staff observed Carmignani sleeping, with his chest rising and falling.

21  CSF ¶ 45.  Deputy Thomas McCloskey took over the tower deputy position from Deputy Johnson

22  for the day-shift.  Fiol Decl., Ex. 13 (McCloskey Dep.) 40:11-15, Dkt. No. 131-4.

23      At approximately noon, Carmignani was found not breathing.  CSF ¶ 46.  Trustee Diaz had

24  observed Carmignani at lunch time and told the Deputy who was serving lunch that Carmignani

25  was in the same position he had been in six hours before.  Diaz Dep. 74:13-76:7.  Jail deputies and

26  medical personnel made efforts to resuscitate Carmignani.  CSF ¶ 47.  He was transported to the

27  hospital, where he was later pronounced dead.  *Id.* ¶ 48.

28  //

1

**B.      The Plaintiffs**

2          Carmignani leaves behind his daughter, Amaya.  *Id.* ¶ 52.  She is represented in this action

3   by her mother, Jamie Ball.  Dkt. No. 90 (Order appointing Jamie Ball as Amaya's Guardian ad

4   Litem).  Carmignani's mother, Lynnette Frary, is also a plaintiff in this suit.  The Alameda

5   Superior Court named Frary the administrator of Carmignani's estate.  Dkt. No. 131-9.  Frary does

6   not claim any loss of financial support from Carmignani.  CSF ¶ 53.  Plaintiff Heather Howard

7   was Carmignani's wife at the time of his death.  *Id.* ¶ 1.

8   **C.      Marin County Jail**

9          The Marin County Jail Policy 11-21 outlines the duties of Lockdown deputies.  Johnson

10  Dep. 49:19-50:25 & Ex. 1.  Section 11-21 required Lockdown deputies to conduct "formal and

11  informal counts," but contains no reference to hourly safety checks.  *Id.*, Ex. 1.  Deputy Johnson

12  testified that he did not recall if there was a written procedure or policy for how safety checks

13  should be performed in the Jail, and he did not recall a written procedure as to how to perform

14  safety checks by a tower deputy.  Johnson Dep. 88:3-89:3.  He also testified that there was no

15  policy or procedure to vary the normal cell check routine in Ad Seg if an inmate housed there was

16  in detox for narcotics use.  *Id.* at 92:6-24.  The County's "person most knowledgeable" witness,

17  Sergeant James Hickey, testified that there was no policy or procedure at the Jail for how to

18  conduct hourly safety checks in Ad Seg.  Hickey Dep. 40:17-20.  He also agreed that the Jail's

19  policy and procedures manual did not address safety check requirements.  *Id.* at 74:5-21.

20  Additionally, Sergeant Hickey testified that he was aware that deputies' use of "tower checks" had

21  been happening prior to 2011.  *Id.* at 42:15-43:6.  Sergeants reviewed the pod logs daily, including

22  logs that showed the deputies performing "tower checks."  *Id.* at 73:11-74:2.

23          Sergeant Hickey further testified that the deputies were not responsible for monitoring

24  medical needs; rather, the jail nurses are responsible for such monitoring.  CSF ¶ 131.  According

25  to Sergeant Hickey, there were no policies or procedures in 2011 requiring the Jail's medical staff

26  to alert the custodial staff as to medical concerns for prisoners entering the Jail's general

27  population.  Hickey Dep. 36:2-10.  There are also electronic files containing inmates' medical

28  information on the computer system available to the Jail deputies, but there is no policy or

United States District Court
Northern District of California

6

procedure requiring them to review this information.  *Id.* at 36:19-37:12.

The Marin County Jail is biennially inspected by the Board of State and Community Corrections (BSCC).  *See* Ganter Decl. ¶¶ 8-9, Dkt. No. 102; Dkt. No. 102-1 & 2, Ex. A (2008-2010 Report) and Dkt. No. 102-3, Ex. B (2010-2012 Report) (collectively, the "Biennial Reports").[5]  On April 15, 2009, the BSCC conducted a pre-inspection briefing with facility managers and administrators.  2008-2010 Report at 1.  The following month, on May 14, 2009, BSCC inspected the jail and holding facility for compliance with physical plant and operational requirements in the California Code of Regulations Titles 15 and 24, Minimum Standards for Local Detention Facilities.  *Id.*  The inspection also included walking through both facilities, reviewing selected policies and supporting documentation, as well as interviewing staff.  *Id.*  After completing its inspection, the BSCC issued an inspection report consisting of, among other things, "procedures" checklists addressing applicable Title 15 sections.  *Id.* at 2.  The following is an excerpt from the 2008-2010 Biennial Report (*see id.* at 8):

| TITLE 15 SECTION | YES | NO | N/A | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|
| 1027   NUMBER OF PERSONNEL | | | | Per written policy and staff schedules reviewed. |
| There are sufficient personnel on duty at all times (whenever there is an inmate in custody) to ensure the implementation and operation of all programs and activities required by these regulations. | X | | | |
| There is a written plan that includes the documentation of hourly safety checks. | X | | | See policy 8-5; Reviewed safety check documentation. |
| There is at least one employee on duty at all times with the ability to respond to any inmate in the event of an emergency (male and/or female; PC § 4021). | X | | | |
| A staffing plan is available which indicates personnel assigned and their duties. | X | | | |
| Inadequacies in the staffing plan are reported, in writing, with recommendations to the local jurisdiction having fiscal responsibility. | X | | | Managed through the budget process. |

---

[5] Plaintiffs object to Defendants' submission of Allison Ganter's Declaration and the attached Reports on the grounds that (1) Defendants failed to disclose Ganter or the Reports in their initial disclosures, (2) the Reports are untrustworthy and inadmissible under Fed. R. Evid. 803(8), (3) Ganter did not properly authenticate the Reports, and (4) the Reports contain inadmissible legal conclusions.  Dkt. No. 132.  From Defendants' response, it appears that they did not disclose Ganter or the Reports in their initial disclosures, but it is also evident that they apprised Plaintiffs about the existence of these reports in response to Plaintiffs' request for production of documents and sent Plaintiffs the Reports in July 2013.  Dkt. No. 138 at 4-7.  There is no evidence of bad faith or willfulness by Defendants, and there is no evidence that Plaintiffs have been prejudiced by the submission of the Reports.  Nor does the Court find the Reports incapable of authentication or otherwise inadmissible at this time.  Plaintiffs' objection about the Reports' legal conclusions is noted, but the Court does not rely on them for such conclusions.  Accordingly, there are no grounds for the excluding these Reports at this time.

1    Both Biennial Reports were sent to Sheriff Robert Doyle.  2008-2010 Report at 1; 2010-

2    2012 Report at 1.

3                                        **LEGAL STANDARD**

4        Summary judgment is proper where the pleadings, discovery and affidavits demonstrate

5    that there is "no genuine dispute as to any material fact and [that] the movant is entitled to

6    judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party moving for summary judgment

7    bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that

8    demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.

9    317, 323 (1986).  Material facts are those that may affect the outcome of the case.  *Anderson v.*

10   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is

11   sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

12       Where the moving party will have the burden of proof on an issue at trial, it must

13   affirmatively demonstrate that no reasonable trier of fact could find other than for the moving

14   party.  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where

15   the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by

16   pointing out to the district court that there is an absence of evidence to support the nonmoving

17   party's case.  *Celotex*, 477 U.S. at 324-25.

18       If the moving party meets its initial burden, the opposing party must then set forth specific

19   facts showing that there is some genuine issue for trial in order to defeat the motion.  Fed. R. Civ.

20   P. 56(e); *Anderson*, 477 U.S. at 250.  It is not the task of the Court to scour the record in search of

21   a genuine issue of triable fact.  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The Court

22   "rel[ies] on the nonmoving party to identify with reasonable particularity the evidence that

23   precludes summary judgment."  *Id.*; *see also Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1017

24   (9th Cir. 2010).  Thus, "[t]he district court need not examine the entire file for evidence

25   establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with

26   adequate references so that it could conveniently be found."  *Carmen v. San Francisco Unified*

27   *Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).  If the nonmoving party fails to make this

28   showing, "the moving party is entitled to a judgment as a matter of law."  *Celotex*, 477 U.S. at 323

United States District Court
Northern District of California

8

(internal quotations omitted).

**DISCUSSION**

Plaintiffs bring claims under 42 U.S.C. § 1983 against the County of Marin, jail staff, and Sheriff Doyle for violations of Carmignani's constitutional rights, as well as state law negligence claims against Nurses Fetterly and Lesher.  In Parts A-C of this Order, the Court considers Defendants' challenges to Plaintiffs' constitutional claims against (A) jail staff (B) Sheriff Doyle, and (C) the County of Marin in its municipal capacity.  In Parts D-E, the Court considers Defendants' challenges to Plaintiffs' state law claims.

**A.      Plaintiffs' Section 1983 Claim – Deputy Defendants**

"Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citation omitted).  Thus, to prevail on a Section 1983 claim, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution; (2) by a person acting under the color of state law.  42 U.S.C. § 1983.  There is no dispute that the deputy Defendants acted under the color of law; thus, the issue is whether their conduct deprived Carmignani of his constitutional rights.

Plaintiffs allege that Marin County, the Jail deputies, and Sheriff Doyle violated Carmignani's constitutional rights through deliberate indifference and callous disregard for his serious medical needs while in custody of the Jail.  As Carmignani was a detainee, not yet charged or convicted of a crime, Plaintiffs' claims for failure to provide care for his serious medical needs are analyzed under the substantive due process clause of the Fourteenth Amendment.  *Lolli v. Cnty. of Orange*, 351 F.3d 410, 418-19 (9th Cir. 2003).  While a detainee's rights arise under the Due Process Clause of the Fourteenth Amendment, the guarantees of the Eighth Amendment guide courts and provide a minimum standard of care for determining detainees' rights, including the right to medical care.  *Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1120 (9th Cir. 2003).  The Fourteenth Amendment "imposes, at a minimum, the same duty the Eighth Amendment imposes: persons in custody have the established right to not have officials remain deliberately indifferent to their serious medical needs."  *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1187 (9th

Cir. 2002) (citation omitted).

1.     Legal Standards: Deliberate Indifference & Qualified Immunity

An official may be held liable under Section 1983 if he or she was "deliberately indifferent" to a serious medical need. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).  To prove this claim, a plaintiff must show that he was: (1) confined under conditions posing a "substantial risk of serious harm," and (2) that the officials were deliberately indifferent to that risk. *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1244 (9th Cir. 2010) (citing *Lolli*, 351 F.3d at 420).  "Deliberate indifference" has both subjective and objective components. *Labatad v. Corr. Corp. of Am.*, 714 F.3d 1155, 1160 (9th Cir. 2013).  A prison official must "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Liability may follow only if a prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Labatad*, 714 F.3d at 1160 (quoting *Farmer*, 511 U.S. at 847); *see also Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) ("Deliberate indifference may be reflected through either action or inaction such as denial, delay, or intentional interference with medical treatment.").

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); additional citation omitted)).  "Qualified immunity shields an officer from liability even if his or her action resulted from a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (citation and quotation marks omitted).  "The purpose of qualified immunity is to strike a balance between the competing need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* (citation and quotation marks omitted).

In determining whether an official is entitled to qualified immunity, courts employ a two-pronged inquiry: first, did the officer violate the plaintiff's constitutional right; if the answer to

that question is "yes," courts must then determine whether the constitutional right was "clearly established in light of the specific context of the case" at the time of the events in question.  *Id.* (citing *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009) and *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014) (citation omitted), *cert. denied*, 135 S.Ct. 455 (2014).

"For the second step in the qualified immunity analysis—whether the constitutional right was clearly established at the time of the conduct—the critical question is whether the contours of the right were 'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'"  *Mattos*, 661 F.3d at 442 (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011); some internal marks omitted).  "The plaintiff bears the burden to show that the contours of the right were clearly established."  *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011).  "[W]hether the law was clearly established must be undertaken in light of the specific context of the case[.]"  *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1050 (9th Cir. 2002) (citation and internal marks omitted).  In making this determination, courts consider the state of the law at the time of the alleged violation and the information possessed by the official to determine whether a reasonable official in a particular factual situation should have been on notice that his or her conduct was illegal.  *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (the "salient question" to the qualified immunity analysis is whether the state of the law at the time gave "fair warning" to the officials that their conduct was unconstitutional).  "[W]here there is no case directly on point, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  *C.B. v. City of Sonora*, 769 F.3d 1005, 1026 (9th Cir. 2014) (citing *al-Kidd*, 131 S.Ct. at 2083).  An official's subjective beliefs are irrelevant.  *Inouye*, 504 F.3d at 712.

2.      Application to the Case at Bar

Plaintiffs assert that Deputies Johnson, McCloskey, and Hammer, as well as Nurse Fetterly, violated Carmignani's Fourteenth Amendment rights by acting with deliberate

11

1    indifference to his serious medical need.  The dispute centers on whether Defendants knew of this

2    need; Defendants argue that none of the individual Defendants had the requisite knowledge.

3           *a.   Deputy Johnson*

4           Defendants argue that "Plaintiffs' own claim of purported lapses in communication

5    between the medical staff and deputies illustrates that [the deputies] were not deliberately

6    indifferent to Decedent's claimed serious medical condition as they remained unaware of

7    Decedent's allegedly serious medical condition."  Reply at 10.  But this does not necessarily hold

8    true for Deputy Johnson.  Deputy Johnson recalled seeing a nurse's statement, which he identified

9    as the corrections entry that noted "Inmate stated that he will 'crash hard.'  Please monitor

10   inmate."  Johnson Dep. 106:18; Ex. 5.  Additionally, Deputy Johnson acknowledged he was aware

11   that Carmignani had drugs in his possession when he came to jail and that Novato Police came to

12   visit Carmignani about stealing medications; Deputy Johnson also testified that he knew arrestees

13   often try to dispose of incriminating evidence by ingesting it.  *Id.* at 117:6-9; 116:11-117:13.

14          On summary judgment, the Court must view the evidence in the light most favorable to the

15   non-moving party—in this case, the Plaintiffs.  *See Anderson*, 477 U.S. at 255.  Under that

16   standard, a reasonable jury could find that Deputy Johnson was aware of the substantial risk to

17   Carmignani and, despite the warning in the jail entry and his knowledge of Carmignani's drug

18   possession, "failed adequately to respond" by providing Carmignani with additional or closer

19   monitoring.  *Lemire v. Cal. Dep't of Corrs. & Rehab.*, 726 F.3d 1062, 1082 (9th Cir. 2013).

20   While Deputy Johnson may have conducted regular checks from the Tower, a jury could find that

21   these checks were inadequate and resulted in the delay or denial of his medical treatment.  Among

22   other things, there is conflicting evidence whether (1) Deputy Johnson could have seen

23   Carmignani or his bed from the Tower (*see, e.g.*, Johnson Dep. 36:22-37:5; 77:13-18; 79:2-8;

24   84:5-8; 175:13-20; 182:1-8; Martinelli Decl. ¶ 37), and (2) whether listening in to Carmignani's

25   cell via the intercom could have in fact detected the sounds of breathing.  *See, e.g.*, Johnson Dep.

26   90:5-16; Fiol Decl., Ex. 1 (Begault Dep.) 13:24-14:4; 49:25-50:6; 63:18-64:20; 66:5-25; Dkt. No.

27   131-2.  Additionally, Deputy Johnson could have called an MRD to check on Carmignani at any

28   time, but he never did so.  Although a jury could ultimately find Deputy Johnson's actions

United States District Court
Northern District of California

reasonable under the circumstances, the Court cannot make that determination on summary judgment in the face of conflicting evidence. Plaintiffs' evidence establishes a genuine dispute of material fact as to whether Deputy Johnson was indeed aware of a substantial risk to Carmignani and then disregarded that risk by failing to take reasonable measures to abate it by, for instance, more closely and regularly monitoring Carmignani.

Where the evidence indicates a constitutional violation, the Court proceeds to the second tier of the immunity analysis. *Estate of Ford*, 301 F.3d at 1049. The second tier in the immunity analysis is "whether the right was clearly established," which is an objective but fact-specific inquiry. *Inouye*, 504 F.3d at 712. Here, Plaintiffs argue that Deputy Johnson is not entitled to qualified immunity because his conduct violated Title 15, section 1027 of the California Code of Regulations, which they assert codifies inmates' constitutional rights. Section 1027 requires that "a sufficient number of personnel shall be employed in each local detention facility to conduct at least hourly safety checks of inmates through direct visual observation of all inmates." Cal. Code Regs. tit. 15, § 1027. The code defines "safety checks" as "direct, visual observation . . . to provide for the health and welfare of inmates." *Id.* § 1006. Plaintiffs contend that a reasonable jail official in Deputy Johnson's position would have known that he was required to conduct hourly direct, visual observations of inmates under section 1027. According to Plaintiffs' expert witness, Ronald Martinelli, a former director of a California Commission on Peace Officer Standards & Training (POST) police and corrections academy, "[t]he necessity for the performance of hourly safety checks is part of the most basic CA - POST training taught to cadets in California's police academies prior to their qualification to serve in entry level positions as custodial officers in jails and prisons throughout the state." Martinelli Decl. ¶ 70. As Deputy Johnson did not conduct such checks, Plaintiffs contend his actions were unlawful.

Assuming for the sake of argument that section 1027 accurately represents the contours of an inmate's constitutional rights, Defendants have shown that a reasonable official in Deputy Johnson's position could "reasonably believe[] that [he was] in compliance with all sections of Title 15 including section 1027 based on the fact that [the Jail] passed the BSCC's biennial inspections which specifically looked for violations as to section 1027." Reply at 11. Plaintiffs do

not dispute that the BSCC's Biennial Reports confirmed that the Jail's safety checks were

complaint with section 1027.[6]  Although Plaintiffs point out that BSCC did not issue a report in

the year of Carmignani's death, they have not shown that Defendants acted differently on days in

question compared with the dates on which the BSCC inspections took place.  In fact, Plaintiffs

agree that the allegedly inadequate "safety checks" were happening in the same way for years

prior to Carmignani's death.  *See* Opp'n at 9.  Thus, even if Deputy Johnson received training on

how to conduct safety checks under section 1027, this evidence in the face of the BSCC

inspections reveals at most an open legal question on how to conduct safety checks under section

1027, and "qualified immunity gives government officials breathing room to make reasonable but

mistaken judgments about open legal questions[.]"  *Padilla v. Yoo*, 678 F.3d 748, 758 (9th Cir.

2012).

> But this is not the end of the inquiry.  First, section 1027 does not describe how often an

inmate should be monitored in light of an identified medical need, and neither did the BSCC

Report at the time.  While "the existence of a statute or ordinance authorizing particular conduct is

a factor which militates in favor of the conclusion that a reasonable official would find that

conduct constitutional," *Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994), here

neither section 1027 nor the BSCC Report explains how to treat inmates with a medical need or

otherwise clearly justify Deputy Johnson's conduct in this case.  Second, the fact that the

requirements of section 1027 may not be clearly established in the context of this case does not

mean that, overall, the state of the law at the time did not otherwise give Deputy Johnson "fair

warning" that his conduct was unconstitutional.  *See id.* ("Where [an ordinance] authorizes official

conduct which is patently violative of fundamental constitutional principles, an officer who

enforces that statute is not entitled to qualified immunity.").  In other words, the "legal question"

here is not whether section 1027's requirements are clearly established but whether the

Constitution's requirements are clearly established.

United States District Court
Northern District of California

---

[6] Plaintiffs maintain elsewhere that the Biennial Reports are flawed and did not accurately analyze the Jail's actual policies and practices in accordance with Title 15, section 1027.  This, however, does not mean a reasonable officer would have known the Report to be flawed or known that acting in accordance with the procedures apparently validated by the BSCC meant that his actions violated section 1027.

The "general law regarding the medical treatment of prisoners was clearly established" well before Carmignani was placed custody in 2011.  *See Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) (citation omitted).  Specifically, before 2011, it was "clearly established that officers could not intentionally deny or delay access to medical care."  *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)); *see also Wereb v. Maui Cnty.*, 727 F. Supp. 2d 898, 916-18 (D. Haw. 2010) *on reconsideration in part on other grounds*, 830 F. Supp. 2d 1026 (D. Haw. 2011) (finding potential constitutional violations and qualified immunity unavailable to jail staff in similar circumstances); *Ringuette v. City of Fall River*, 888 F. Supp. 258, 269-70 (D. Mass. 1995) (finding qualified immunity "intertwined with the correlative jury question[,]" and "hing[ing] on material issues of relevant fact that remain in dispute: the extent of the monitoring, the reasons for failure to monitor, whether and when [plaintiff] declined food and water, his appearance during the monitoring, etc.").

While Plaintiffs did not provide case law on point, viewing the facts in the light most favorable to them, a reasonable jury could find that Deputy Johnson's failure to take any action to respond to the increased risk to Carmignani's health caused the delay or denial of medical care to Carmignani.  Specifically, rather than taking additional steps to ensure that Carmignani was monitored, Plaintiffs' evidence suggests that Deputy Johnson conducted only his typical tower checks, which—at most—allowed Deputy Johnson to only see a quarter of Carmignani's bed from a considerable distance.  Although Deputy Johnson testified that there was no Jail procedure or policy for increased monitoring of inmates with medical needs in Ad Seg (Johnson Dep. 92:6-24), the lack of such a policy or procedure does not make Deputy Johnson's conduct reasonable.  A reasonable official in Deputy Johnson's position would have understood that placing an inmate with a perceived medical need in a cell where the inmate cannot be seen, and then not taking any other precautions to monitor or observe that inmate, is not taking reasonable measures to abate the risk to that inmate and effectively causes the delay or denial of medical care.  At the time Carmignani was under Deputy Johnson's care and custody, viewing the facts in the light most favorable to the Plaintiffs, a "reasonable official would have understood that what he is doing violates" Carmignani's right not to have his medical needs treated with deliberate indifference.

*Mattos*, 661 F.3d at 442 (quoting *al-Kidd*, 131 S. Ct. at 2083).  Accordingly, Deputy Johnson is not entitled to qualified immunity, and Defendants' Motion for Summary Judgment on Plaintiffs' Section 1983 claim against Deputy Johnson is **DENIED**.

    *b.   Deputy McCloskey*

There is no evidence that Deputy McCloskey knew of any risk to Carmignani such that his subsequent actions could be found to have been made with a sufficiently culpable state of mind. There is no indication that any other jail officials ever reported any of their observations to Deputy McCloskey or otherwise openly expressed their belief to him that Carmignani was in need of medical assistance.  Plaintiffs' own statement of fact admits as much.  *See* CSF ¶ 129 ("Deputy McCloskey . . . was not aware that Mr. Carmignani's[sic] has been observed for opiate detoxification or withdrawal. . . .  He was not aware of any of the things that the medical staff knew about Mr. Carmignani: including his admitting to taking opiates . . . his presentation with pinpoint eyes, his expressed expectation that he would 'crash hard,' or his request for assurance that his cell would have a working intercom.").  Nor is there evidence showing that Deputy McCloskey was made aware of Carmignani's condition through any other means.  *See* McCloskey Dep. 66:19-67:7; 68-2-6.  While Plaintiffs argue that Deputy McCloskey, like Deputy Johnson, failed to conduct direct, visual safety checks as required by Title 15, section 1027, Plaintiffs have not shown that Deputy McCloskey was subjectively aware of Carmignani's medical need or any substantial risk to him such that the checks Deputy McCloskey conducted could be found to be evidence of deliberate indifference.

Plaintiffs further assert that Deputy McCloskey could have looked at Carmignani's inmate records on the computer to know of his medical need, but this evidence shows only that Deputy McCloskey *should have* been aware of Carmignani's medical need, not that he in fact was aware of such a need.  *See Farmer*, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."); *see also Dean v. City of Fresno*, 546 F. Supp. 2d 798, 813 (E.D. Cal. 2008) (officers did not violate decedent's right to medical care where evidence suggested they *should have* suspected decedent had swallowed cocaine but the evidence

16

1    was not strong enough not support a finding that the officers *actually knew* this event occurred);

2    *Wereb*, 727 F. Supp. 2d at 913 ("Individual Defendants' subjective knowledge that [the decedent]

3    could have been monitored more closely or more thoroughly is not commensurate with subjective

4    knowledge that [the decedent] faced a substantial risk due to a lack of close or thorough

5    monitoring."). Accordingly, Defendants' Motion for Summary Judgment on Plaintiffs' Section

6    1983 claim against Deputy McCloskey is **GRANTED**.

7                    *c. Deputy Hammer*

8             While there is no evidence that Deputy Hammer knew Carmignani had ingested illegal

9    drugs or was predisposed to any other medical need, there is a genuine dispute of material fact as

10   to whether she was aware of Carmignani's serious medical need when she encountered him on the

11   morning of his death. Deputy Hammer testified that she tried to wake Carmignani, asking him if

12   he wanted breakfast, but he did not respond. Hammer Dep. 121:23-122:2. She testified that she

13   tried talking to him, but he did not respond except for snoring; his eyes stayed closed, and she did

14   not observe him move. *Id.* at 120:8-13; 120:25-121:20. Deputy Hammer also testified that she

15   elevated her voice to get Carmignani's attention; even when she yelled, he did not respond. *Id.* at

16   145:22-146:4. She also knocked on the window of Carmignani's cell, knocking three or four

17   times and characterizing her knock as "hard." *Id.* at 122:3-21. The knocks elicited no response

18   from Carmignani other than perhaps snoring. *Id.* at 122:22-24. At her deposition, Deputy

19   Hammer was read a statement made by Trustee Diaz, which stated that Deputy Hammer had

20   called out to Carmignani for approximately one minute and that Trustee Diaz remembered

21   commenting to Deputy Hammer that Carmignani "looks dead." *Id.* at 134:24-135:9. Deputy

22   Hammer did not dispute this statement but instead stated that she does not remember. *Id.* at

23   135:15-20. Deputy Hammer also reported to the Deputy Johnson over her radio that Carmignani

24   had "refused" breakfast. *Id.* at 124:14-21. Deputy Hammer instructed the trustees to remove the

25   food tray from the access slot and move on. Diaz Dep. 73:11-13.

26           There is a genuine dispute of material fact as to whether Deputy Hammer acted with

27   deliberate indifference to Carmignani's serious medical need. A medical need is serious "if the

28   failure to treat the [detainee's] condition could result in further significant injury or the

United States District Court
Northern District of California

1    unnecessary and wanton infliction of pain." *Jett*, 439 F.3d at 1096.  There is evidence that Deputy

2    Hammer was aware that Carmignani's failure to respond could give rise to knowledge of a serious

3    medical need.  Another jail deputy, Anthony Thune, testified that "we were taught if we have a

4    person that cannot respond to you, that will not wake up, we're going to call for medical and

5    provide whatever assistance we can until they get there, and then assist medical with whatever

6    assistance they need. Q. []: That's something you were taught here at the jail?  A. Yes."  Thune

7    Dep. 29:15-23, Dkt. No. 186, Ex. 1.  Deputy Johnson likewise agreed that when he worked in

8    Deputy Hammer's position, when an inmate does not get up to accept the meal, his training and

9    practice is to obtain an "audible declination or gesture" that the prisoner does not want his meal.

10   Johnson Dep. 186:4-187:4.  Here, Deputy Hammer yelled and knocked hard on Carmignani's door

11   but received no response from him other than perhaps a snore.  Then, when Deputy Hammer

12   radioed Deputy Johnson, she indicated that Carmignani had "refused" food, rather than telling

13   Deputy Johnson that Carmignani did not wake despite her repeated attempts to awaken him.

14         A reasonable jury could find that Deputy Hammer acted with deliberate indifference by

15   denying, delaying, and interfering with Carmignani's medical treatment when she failed to

16   ascertain the circumstances of his prolonged unconsciousness as well as when she radioed Deputy

17   Johnson falsely suggesting that Carmignani had consciously "refused" breakfast.  There is also a

18   triable issue of fact as to whether Deputy Hammer observed Carmignani's physical state as

19   described by Trustee Diaz.  Based on the evidence presented, a reasonable juror could conclude

20   that Deputy Hammer "kn[ew] of and disregard[ed] an excessive risk to [Carmignani's] health or

21   safety" and that she was "both . . . aware of facts from which the inference could be drawn that a

22   substantial risk of serious harm exist[ed], and . . . also dr[e]w the inference."  *Farmer*, 511 U.S. at

23   837.  Thus, summary judgment is inappropriate on this ground.

24         Likewise, the Court cannot find that Deputy Hammer is entitled to qualified immunity.

25   Before Carmignani's death in 2011, it was "clearly established that officers could not intentionally

26   deny or delay access to medical care."  *Clement*, 298 F.3d at 906.  Viewing the facts in the light

27   most favorable to the Plaintiffs, a reasonable jury could find that Deputy Hammer failed to take

28   any action at all to respond to Carmignani's obvious medical need when he was unresponsive to

United States District Court
Northern District of California

her forceful attempts to wake him and in light of his physical condition as described by Trustee Diaz. On these facts, it would be clear to a reasonable official in Deputy Hammer's position that her actions were "unlawful in the situation [s]he confronted." *Estate of Ford*, 301 F.3d at 1050 (quotation omitted). A "reasonable official" in Deputy Hammer's position would have understood that her actions violated Carmignani's right not to have his medical need treated with deliberate indifference. *Mattos*, 661 F.3d at 442 (quoting *al-Kidd*, 131 S. Ct. at 2083). Accordingly, Deputy Hammer is not entitled to qualified immunity and summary judgment on this claim is **DENIED**.

### d. Nurse Fetterly

Plaintiffs' operative Complaint does not include a Section 1983 claim against either Nurse Fetterly or Nurse Lesher. *See generally* Second. Am. Compl. However, Plaintiffs' opposition brief argued the merits of those claims as if they had, and Defendants did not recognize Plaintiffs' oversight in their briefing. Apparently neither party recognized this defect until the Court raised the issue at the hearing. Now Plaintiffs have filed an official motion for leave to amend their complaint (for a third time)—but only for Nurse Fetterly; they have apparently decided to forgo their previously argued constitutional claims against Nurse Lesher. *See* Dkt. No. 180. Meanwhile, Defendants adamantly oppose Plaintiffs' motion to amend despite already mounting a defense on Nurse Fetterly's behalf. Dkt. No. 182.

The Ninth Circuit has recently reiterated that "when issues are raised in opposition to a motion to summary judgment that are outside the scope of the complaint, 'the district court should . . . construe[] the matter raised as a request pursuant to rule 15(b) of the Federal Rules of Civil Procedure to amend the pleadings out of time.'" *Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1154 (9th Cir. 2014) (quoting *Apache Survival Coal. v. United States*, 21 F.3d 895, 910 (9th Cir. 1994); internal marks omitted)). "Five factors are taken into account to assess the propriety of a motion for leave to amend: bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint." *Id.* "The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits." Fed. R. Civ. P. 15(b)(1).

1       Here, as noted, both sides apparently were under the misconception that the constitutional

2   claims had already been asserted against Nurse Fetterly.  The Defendants and Plaintiffs fully

3   argued the issues related to the constitutional claims against the individual jail staff, and

4   Defendants have not otherwise shown how they have been or could be prejudiced by permitting

5   constitutional claims against Nurse Fetterly.  *See* Reply at 11 (specifically arguing that Nurse

6   Fetterly is entitled to qualified immunity as a defense to Plaintiffs' section 1983 claim).  Thus

7   Defendants' objections do not satisfy the Court that the addition of Nurse Fetterly would prejudice

8   their defense.  *See Desertrain*, 754 F.3d at 1155 (finding "unpersuasive" any claim of surprise or

9   prejudice by defendants where both parties fully argued claim at issue in their summary judgment

10  briefings); *see also Feduniak v. Old Republic Nat'l Title Co.*, 2014 WL 6603253, at *5 (N.D. Cal.

11  Nov. 20, 2014) (granting leave to amend where both parties apparently understood the complaint

12  to assert the disputed theories and considering those theories on summary judgment).

13      Nor is there evidence of bad faith or undue delay.  While Plaintiffs' overall tardiness in

14  seeking to amend is certainly not commendable, the Court agrees that Plaintiffs moved reasonably

15  promptly to amend when they were apprised of the inconsistency in their Complaint and

16  opposition brief.  Although Plaintiffs have had the opportunity to amend their Complaint before,

17  as discussed, it appears that both parties were under the misconception that the constitutional

18  claims had already been asserted.  Having considered the pertinent factors, the Court will thus

19  construe Plaintiffs' argument against Nurse Fetterly on the merits, conforming to the evidence and

20  arguments raised at this time.

21      The Court finds there is a question of fact about what Nurse Fetterly believed the risk to

22  Carmignani to be and whether she acted with deliberate indifference to that risk.  Nurse Fetterly

23  was aware that Carmignani was "definitely under the influence of something[,]" and these

24  observations caused her to believe "he needed to be observed in booking longer.  He was not ready

25  to go upstairs."  Fetterly Dep. 145:1-8.  This indicates both her awareness of the risk to

26  Carmignani and her understanding that such a risk was better confronted at the nursing station.

27  Nurse Fetterly also listed Carmignani as "high risk" and "unstable" in the inmate status report and

28  indicated that he should be observed for opiate detoxification.  Johnson Dep., Ex. 4; Fetterly Dep.

United States District Court
Northern District of California

186:4-17; 187:1-11.  The corrections entry further indicates that she communicated to another jail official that Carmignani had taken street morphine pills, that he stated he would "crash hard," and to "Please monitor inmate."  *See* Johnson Dep., Ex. 5.

This evidence suggests that Nurse Fetterly identified Carmignani as high risk and understood that there was enough of a risk to Carmignani's safety to warrant additional precautionary measures.  This is different from cases where the official had no knowledge of the critical facts giving rise to the detainee's serious medical need.  *Cf. Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004) (no deliberate indifference where prison doctor administered prescription drugs causing inmate's fatal overdose where doctor had no knowledge that inmate had already ingested large amounts of contraband prescription drugs).  Here, Nurse Fetterly knew that Carmignani had ingested street morphine pills and admitted that Carmignani made it "very well-known" to her that he was worried about his health and had concerns about that he would "crash hard" and "detox bad."

Taking the facts in the light most favorable to Plaintiffs, a reasonable jury could find that Nurse Fetterly recognized a serious risk to Carmignani and then failed to take reasonable precautionary steps to protect Carmignani from that risk.  Deliberate indifference may be shown through inaction and through withholding medical treatment.  *See Lolli*, 351 F.3d at 419; *Hallett*, 296 F.3d at 744.  A reasonable jury could find that Nurse Fetterly acted with deliberate indifference when she allowed Carmignani to go into the Jail's general population prior to when Carmignani began to "crash hard" or "detox bad" as he made "very-well known" to her that he would or by failing to take action to ensure that Carmignani was consistently monitored.  Likewise, a reasonable jury could find that it was not reasonable to expect Carmignani to self-monitor for adverse drug reactions and, in such an event, seek help via an intercom.  Based on the evidence presented, a reasonable juror could conclude that Nurse Fetterly "kn[ew] of and disregard[ed] an excessive risk to [Carmignani's] health or safety" by failing to take reasonable measures to abate that risk.  *Farmer*, 511 U.S. at 837.  On the other hand, a jury could find that Nurse Fetterly did not realize the extent of the risk Carmignani faced, as he apparently kept from her the extent of his drug usage; thus, as a jury could find that she took objectively reasonable

United States District Court
Northern District of California

United States District Court
Northern District of California

1   measures to abate the risk she perceived by, among other things, checking Carmignani's vital

2   signs and keeping him for monitoring for approximately four hours.

3          On summary judgment, the Court must take the facts in the light most favorable to the non-

4   moving party.  While the resolution of the factual issues in this case may well relieve Nurse

5   Fetterly of liability, if Plaintiffs' version of the facts were to prevail, a reasonable jury might well

6   conclude that she was deliberately indifferent to Carmignani's serious medical needs.  As it is

7   "clearly established that officers [can] not intentionally deny or delay access to medical care,"

8   *Clement*, 298 F.3d at 906, Nurse Fetterly is not presently entitled to qualified immunity on this

9   claim.  Defendants' motion for summary judgment is therefore **DENIED** on Plaintiffs' Section

10  1983 claim against Nurse Fetterly.

11  B.     **Section 1983 Claim - Supervisor Liability**

12         Supervisory officials "may not be held liable for the unconstitutional conduct of their

13  subordinates under a theory of respondeat superior."  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

14  The term supervisory liability is therefore something of a "misnomer" because "[e]ach

15  Government official, his or her title notwithstanding, is only liable for his or her own misconduct."

16  *Id.* at 677; *see also Lemire*, 726 F.3d at 1074-75 ("Vicarious liability may not be imposed on a

17  supervisor for the acts of lower officials in a section 1983 action.").  Supervisory officials "cannot

18  be held liable unless they themselves" violated a constitutional right.  *Iqbal*, 556 U.S. at 683.

19         However, a supervisor may still be held liable for under section 1983 upon a showing of

20  either "(1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient

21  causal connection between the supervisor's wrongful conduct and the constitutional violation."

22  *Starr v. Baca,* 652 F.3d 1202, 1207 (9th Cir. 2011); *see also Taylor v. List*, 880 F.2d 1040, 1045

23  (9th Cir. 1989) ("A supervisor is only liable for constitutional violations of his subordinates if [he]

24  . . . directed the violations, or knew of the violations and failed to act to prevent them.").  The

25  requisite causal connection may be proved by (i) the supervisor's "own culpable action or inaction

26  in the training, supervision, or control of subordinates;" (ii) his "acquiescence in the constitutional

27  deprivation of which a complaint is made;" or (iii) "conduct that showed a reckless or callous

28  indifference to the rights of others."  *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000).

United States District Court
Northern District of California

1    Plaintiffs provide little explanation about their theory of supervisory liability against

2   Sheriff Doyle, but argue that "Sheriff Doyle's legal duties are clear, and the multiple failures of his

3   department to enact, train to [sic] and enforce necessary and state-mandated policies and

4   procedures must be placed squarely on his doorstep."  Opp'n at 12.  Defendants contend that

5   Plaintiffs have failed to provide facts supporting these claims and also argue that Sheriff Doyle is

6   entitled to qualified immunity.  Mot. at 14-15; Reply at 8-9.

7    There is no evidence that Sheriff Doyle personally participated in any of his subordinates'

8   potential deliberate indifference to Carmignani; Sheriff Doyle was not present during the events in

9   question.  Additionally, Defendants argue there is no evidence Sheriff Doyle was responsible for

10   any unconstitutional customs, policies, practices, and procedures giving rise to such deliberate

11   indifference as alleged in Plaintiffs' Complaint.  They argue Sheriff Doyle was not in fact

12   responsible for creating, evaluating, and modifying jail policies/procedures.  Giacomini Brewer,

13   Ex. N (Hickey Dep.) 20:19-22:1; 26:6-8, Dkt. No. 101-3.  Rather, they assert that the jail captain

14   is primarily responsible for implementation of policy at Marin County Jail.  *Id.* at 30:9-11; Hickey

15   Decl. ¶ 5.

16    In response, Plaintiffs argue that the responsibility for adopting and enforcing jail policies

17   and procedures is assigned by Title 15, section 1029, which defines "Facility Administrators" as

18   "the sheriff, chief of police, chief probation officer, *or* other official charged by law with the

19   administration of a local detention facility/system."  *See* Cal. Code Regs. tit. 15, § 1029 (emphasis

20   added).  The critical word in section 1029's definition is "or"—the provision does not say the

21   Sheriff must be the Facility Administrator.  Additionally, Plaintiffs present Marin County Sheriff's

22   Departmental Policies, Policy 1-2, which states that the Sheriff is the "Overall administrator of the

23   Sheriff's Department, charged by law with the administration of local detention facilities in Marin

24   County."  Martinelli Decl., Ex. 4.  The problem is that neither party provided evidence about

25   Sheriff Doyle's actual duties or whether he actually functioned as the jail administrator.

26    As the limited evidence available to the Court is conflicting, summary judgment is

27   inappropriate at this time.  There remains a material dispute as to Sheriff Doyle's actions or

28   inactions, and whether any of those actions could constitute a constitutional violation.  Qualified

immunity is likewise unavailable as the Court cannot determine at this point what if any actions Sheriff Doyle took in order to assess whether it would be clear to a reasonable supervisor that his conduct was unlawful.  *See Chavez v. United States*, 683 F.3d 1102, 1110 (9th Cir. 2012) (where a Section 1983 claim is brought against a supervising official, qualified immunity is taken into account, and a supervisor faces liability only where it would be clear to a reasonable supervisor that his conduct was unlawful in the situation he confronted); *see also LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 953 (9th Cir. 2000) (if "there is a material dispute as to the facts regarding what the [supervisor] actually did, the case must proceed to trial" (citing *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993))).  Accordingly, Defendants' Motion for Summary Judgment on this claim is **DENIED**.

C.     **Section 1983 – Municipality Liability**

Plaintiffs also bring Section 1983 claims against the County of Marin in its municipal capacity.  A municipality or other local government may be liable under Section 1983 if the governmental body "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation.  *Monell v. N.Y. City Dep't of Social Servs.*, 436 U.S. 658, 691-92 (1978).  While municipalities cannot be held vicariously liable under Section 1983 for their employees' actions, municipalities can be liable for policies, customs, practices, and or procedures that violate constitutionally protected rights.  *Id.* at 691.  A plaintiff must go beyond the respondeat superior theory of liability and demonstrate that the alleged constitutional deprivation was the product of a policy or custom of the local governmental unit, because municipal liability must rest on the actions of the municipality and not the actions of the employees of the municipality.  *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011).  The Supreme Court has emphasized that "[w]here a plaintiff claims that the municipality . . . has caused an employee to [violate plaintiff's constitutional rights], rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."  *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997).  Thus, "a plaintiff seeking to impose liability on a municipality under § 1983" is required "to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."  *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1232-

1   33 (9th Cir. 2011) (citations and quotation marks omitted).

2       "Official municipal policy includes the decisions of a government's lawmakers, the acts of

3   its policymaking officials, and practices so persistent and widespread as to practically have the

4   force of law." *Connick*, 131 S. Ct. at 1359.  Absent a formal governmental policy, a plaintiff must

5   show a "longstanding practice or custom which constitutes the standard operating procedure of the

6   local government entity." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996), *holding modified on*

7   *other ground by Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001).  "[A]n act performed pursuant to

8   a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly

9   subject a municipality to liability on the theory that the relevant practice is so widespread as to

10  have the force of law." *Brown*, 520 U.S. at 404.  Moreover, a policy of inaction may be a

11  municipal policy within the meaning of *Monell*.  *See Long v. Cnty. of Los Angeles*, 442 F.3d 1178,

12  1185 (9th Cir. 2006); *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002) (per curiam).  "[A]

13  local governmental body may be liable if it has a policy of inaction and such inaction amounts to a

14  failure to protect constitutional rights." *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992)

15  (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

16       "To impose liability against a county for its failure to act, a plaintiff must show: (1) that a

17  county employee violated the plaintiff's constitutional rights; (2) that the county has customs or

18  policies that amount to deliberate indifference; and (3) that these customs or policies were the

19  moving force behind the employee's violation of constitutional rights.  *Long*, 442 F.3d at 1186

20  (citing *Gibson*, 290 F.3d at 1193-94).  For a policy to be the moving force behind the deprivation

21  of a constitutional right, the identified deficiency in the policy must be "closely related to the

22  ultimate injury." *Gibson*, 290 F.3d at 1196 (citation omitted).  Plaintiffs' burden is to establish

23  "that the injury would have been avoided" had proper policies been implemented.  *Id.* (quotation

24  omitted).  Here, Plaintiffs have identified several policies and practices that they allege were the

25  moving force behind the violations of Carmignani's constitutional rights.

26       1.      Inadequate Monitoring Procedures

27       Plaintiffs challenge the County's policy of allowing "safety checks" without hourly,

28  "direct visual observation[s]" in violation of Title 15, section 1027 of the California Code of

United States District Court
Northern District of California

1    Regulations.  Cal. Code Regs. tit. 15, § 1027; *see also id.* § 1006 (defining "safety checks" as

2    "direct, visual observation . . . to provide for the health and welfare of inmates.").  Although

3    Plaintiffs did not specifically state how this failure to comply with section 1027 led to a

4    constitutional violation, the inference of this alleged noncompliance is, as stated by Plaintiffs'

5    Expert, Dr. Neal Benowitz, that "[h]ad [Carmignani] been monitored, his health care providers

6    and others at the jail would have recognized when he became medically unstable" and would have

7    responded in time to save Carmignani's life.  Giacomini Brewer Decl., Ex. G (Benowitz Report)

8    ¶ 18, Dkt. No. 101.

9           The essence of Plaintiffs' argument thus focuses on the Jail's practice of inadequately

10   monitoring inmates and particularly those inmates with serious medical needs.  Defendants argue

11   that if the Court finds a constitutional violation, the circumstances giving rise to that violation

12   arise out of a single instance of unconstitutional activity, not "a constitutionally deficient County

13   Jail policy regarding medical care to inmates nor . . . a constitutionally deficient pattern or practice

14   of deliberate indifference to inmates' medical needs at the County Jail."  Mot. at 18.  Defendants

15   are correct that "[p]roof of a single incident of unconstitutional activity is not sufficient to impose

16   liability under *Monell*, unless proof of the incident includes proof that it was caused by an

17   existing, unconstitutional [local government] policy, which policy can be attributed to a [local

18   government] policymaker."  *Meehan v. Cnty. of San Diego*, 856 F.2d 102, 107 (9th Cir. 1988); *see*

19   *also Connick*, 131 S. Ct. at 1360 n.7 ("[C]ontemporaneous or subsequent conduct cannot establish

20   a pattern of violations that would provide 'notice to the cit[y] and the opportunity to conform to

21   constitutional dictates . . .'").  But here, Plaintiffs argue that there was more than a singular instance

22   of misconduct.  They contend it was the Jail's regular practice and standard operating procedure to

23   inadequately monitor inmates.  Specifically, Plaintiffs maintain that the Jail's regular practice and

24   operating procedure was only to observe inmates indirectly, using "tower checks" where deputies

25   looked out the tower window to observe the inmates from dozens of feet away, or listening to

26   inmates in through intercoms in their cells.  CSF ¶¶ 157, 192-96.

27          When viewed in the light most favorable to Plaintiffs, a reasonable jury could find that the

28   record demonstrates that the County's policy and practice of allowing tower checks as a

United States District Court
Northern District of California

26

United States District Court
Northern District of California

replacement for more regular and direct monitoring was the moving force behind the violation of

Carmignani's constitutional rights.  First, the record establishes that regular monitoring is essential

to the overall safety and welfare of inmates and particularly those inmates experiencing drug

overdoses or other reactions.  Title 15, section 1006 defines "safety checks" as "direct, visual

observation . . . to provide *for the health and welfare of inmates*," Cal. Code Regs. tit. 15, § 1006

(emphasis added), with the natural inference that safety checks are important to maintaining "the

health and welfare" of inmates.  Section 1027's statement that safety checks should be performed

"at least hourly" objectively indicates that performing safety checks on a regular basis is part of

maintaining inmates' health and welfare.  Moreover, the Guideline for section 1027 provides that

"[t]he intent of the safety check is to account for the presence of the inmate, identify if anything

appears out of order and look for signs of observable distress or trauma. This includes looking for

indications that the inmate may be ill, injured, . . . or otherwise be in need of assistance."

Martinelli Decl., Dkt. No. 131-5, Ex. 3 at 27.  The Guideline also states "[s]ome inmates may

require more frequent checks based on their special problems or if the configuration of the jail

includes blind spots or other factors that result in poor inmate visibility. The more frequently staff

observes inmates, the more opportunity there is to supervise their activity and intervene when

required." *Id.*  Title 15 and its Guideline support Dr. Benowitz's conclusion that better and more

frequent monitoring may have discovered Carmignani's medical need and prevented his death.

Benowitz Report ¶ 18.[7]

Second, courts have found that such failure to monitor inmates can result in substantial risk

to their serious medical needs.  *See, e.g.*, *Estate of Abdollahi v. Cnty. of Sacramento*, 405 F. Supp.

2d 1194, 1206 (E.D. Cal. 2005) (denying county's summary judgment motion where a reasonable

jury could find the jail's failure to conduct regular safety checks as stated in Title 15, section 1027

posed a substantial risk to inmates); *Wereb*, 727 F. Supp. 2d at 923; *Morris v. Dallas Cnty.*, 960 F.

---

[7] Importantly, Defendants have submitted contradictory evidence by Dr. Raymond Deutsch, who notes that "[v]isual observations performed by the deputies would not have made it obvious or even apparent that they needed to summon medical care.  Even if visual inspections were performed at other times by the deputies, it would not have made any difference as Mr. Carmignani would have appeared as if he was sleeping."  Deutsch Decl. ¶ 6, Dkt. No. 99.  This evidence highlights a genuine dispute of material fact related to proof of causation.

Supp. 2d 665, 686 (N.D. Tex. 2013).  Indeed, in *Wereb*, the court concluded that "a reasonable factfinder could find that the failure to provide detainees with the right to medical care was an obvious consequence of Maui County's employees' failure to closely monitor detainees or view them in person."  727 F. Supp. 2d at 923.  The defendants had failed to follow police department protocols, which required in-person visual checks of detainees, and instead had surveyed the decedent, Wereb, primarily through video monitoring.  *Id.* at 903.  Despite purportedly monitoring Wereb every fifteen minutes via video, Wereb was found dead in his cell around twenty-seven hours after his last recorded movement.  *Id.*  As in this case, the *Wereb* defendants did not conduct regular direct, visual observations of the inmate and instead primarily relied on alternative methods of observation, which did not necessarily reveal an accurate and complete picture of the inmate's condition.  *Id.* at 923.  The *Wereb* court concluded that given the known drawbacks of the alternative monitoring methods, it should have been obvious to Maui County that "monitoring detainees exclusively by video would deprive county employees of an accurate understanding of detainees' medical needs."  *Id.*  These facts precluded summary judgment.

Here, a reasonable jury could conclude that failure to provide regular monitoring was evidence of the County's deliberate indifference to substantial risks to inmates.  *See Connick*, 131 S. Ct. at 1361-63 (recognizing that in some cases the likelihood of constitutional violations is an obvious consequence of a county's policy or practice).  Among other things, a reasonable jury could conclude that the County's tower checks would not allow deputies to adequately observe inmates such as Carmignani.  Likewise, as in *Wereb*, the Jail's choice to allow an alternative method of monitoring to take the place of direct visual observations could be found inadequate to protect inmates from substantial risks posed to them while in the Jail.  Ultimately, a reasonable juror could conclude that the County's practice and standard operating procedure of conducting indirect safety checks and monitoring posed a substantial risk to Carmignani, the County was aware of that risk, and the County's practice and standard operating procedure was the moving force behind the constitutional violation.  Accordingly, the Court finds that genuine issues of material fact remain as to the County's practice and standard operating procedure relating to inmate monitoring.

United States District Court
Northern District of California

2.      Failure to Implement Policies for Conducting Monitoring/Safety Checks

Also related to the issue of monitoring is Plaintiffs' assertion that the County failed to develop and implement necessary policies for how to conduct proper safety checks.  Plaintiffs presented evidence from the County's person most knowledgeable witness, Sergeant Hickey, that that the County had no policies specifically addressing the safety check requirement of section 1027.  Hickey Dep. 74:10-21.  Additionally, he testified that "[m]onitoring of medical is done by our nursing and should be done by our nursing.  Deputies aren't checking for any kind of medical emergency, dire need.  They should not be in observation of a medical need."  CSF ¶ 131.

In *Morris*, the court found that fact issues relating to a jail's lack of monitoring precluded summary judgment on a municipal liability claim.  960 F. Supp. 2d at 686.  Specifically, the plaintiffs presented evidence that Dallas County's policy or custom was not to monitor inmates or observe them for their physical or medical needs.  *Id.*  The only time direct visual observations occurred was during meals or hygiene/cleanliness checks.  *Id.*  Moreover, Dallas County stipulated that the jail staff did not monitor the medical condition of the inmates, nor were there policies for such monitoring.  *Id.*  This evidence, coupled with the admission that the jail did not have a procedure by which guards would pass on health information to the nursing staff, led the *Morris* court to conclude that genuine issues of material fact remained, precluding summary judgment on plaintiffs' municipal liability claim.  *Id.*

While *Morris* is merely persuasive authority, the Ninth Circuit has "consistently has found that a county's lack of affirmative policies or procedures to guide employees can amount to deliberate indifference, even when the county has other general policies in place."  *Long*, 442 F.3d at 1189.  Here, taking the facts in the light most favorable to the Plaintiffs, the County's failure to implement policies about how to monitor inmates and particularly those with medical needs fails to adequately instruct deputies of their responsibilities.  In turn, a reasonable jury could find the County's decision not to enact such policies is predictably likely to result in the violation of detainees' rights to not have their medical needs met with deliberate indifference.  The obvious consequence of the County's failure to enact such policies is demonstrated by Sergeant Hickey's belief that the deputies are not responsible for monitoring for medical needs at all.  There is also

conflicting evidence in the record about how the safety checks are performed, with some deputies taking more careful steps to monitor inmates and other deputies only primarily using tower checks.  *See* CSF ¶ 199.  The record establishes a triable issue as to whether the County's failure to implement a policy outlining the specific requirements for adequately monitoring detainees amounted to deliberate indifference to Carmignani's constitutional rights.

        3.      <u>Communication Deficiencies</u>

       Plaintiffs also challenge the policies and practices relating to communications about inmates' medical needs between the Jail's medical staff and deputies.  First, Plaintiffs challenge the use of Marin County Jail Medical and Mental Health Services Policy 705, which in 2011 stated: "[t]he Detention physician, Nurse Manager or DHS, or any health care staff designee, shall communicate information obtained in the course of medical/mental health screening and care, to jail authorities when necessary for the protection of the welfare of the prisoner, or others, management of the jail, or maintenance of jail security."  CSF ¶ 130 (citing Martinelli Decl., Ex. 8 at 4).  According to Plaintiffs, the Jail's administrators "allowed [this] vital tool for prisoner protection to be ignored and forgotten."  Opp'n at 10.  Sergeant Hickey testified that there were no policies or procedures in 2011 requiring the Jail's medical staff to alert the custodial staff as to medical concerns for prisoners entering the Jail's general population.  Hickey Dep. 36:2-10.

       Second, Plaintiffs assert that the Jail failed "to provide training to medical staff and issue policies and procedures on the proper input of critical medical information into the jail's central computer system . . . ."  Opp'n at 11.  Sergeant Hickey also testified that while there were electronic files containing inmates' medical information on the computer system available to the Jail deputies, there was no policy or procedure requiring them to review this information.  *Id.* at 36:19-37:12.  Third, Plaintiffs assert that the Jail failed to have appropriate communication protocols with respect to medications taken off a person booked into the jail.  Opp'n at 11.  Among other things, Plaintiffs point out that an Embeda pill was found on Carmignani at the time of booking and the deputy who discovered the pill then did not inform the Jail's medical staff or anyone else about the discovery of this pill.

       As described above, a municipality's failure to implement policies can amount to

30

deliberate indifference.  *See Long*, 442 F.3d at 1189.  Additionally, a county's failure to "adequately to train its employees to implement a facially valid policy can amount to deliberate indifference."  *Id.* at 1188 (citing *Berry v. Baca*, 379 F.3d 764, 768 (9th Cir. 2004) (even where county's policy for releasing inmates was theoretically reasonable, as a matter of law, the county could not be immune from allegations that, in practice, its implementation of the policy amounted to deliberate indifference)).

Here, Sergeant Hickey testified that it is a recurring situation where inmates with medical needs are sent into the Jail's general population; however, he also recognized that there were no policies or procedures in 2011 requiring the Jail's medical staff to alert the custodial staff about those inmates' medical issues.  Hickey Dep. 36:2-10.  The fact that the Jail was aware that inmates in general population have medical issues but there is no enforced method or training as to whether and how to communicate information about those medical issues suggests deliberate indifference to inmates' medical needs.  *See Morris*, 960 F. Supp. 2d at 686-87.  Specifically, the record indicates that the Jail knew there were inmates with medical needs, but it does not have clear policies or trainings for medical staff and deputies to be informed of those needs so that they may be able to react and pass along information as necessary.  *See Johnson v. Hawe*, 388 F.3d 676, 686 (9th Cir. 2004) ("[A] violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.").  This evidence raises triable issues regarding whether the County's failure to implement, train, and enforce policies on communications between the Jail's deputies and medical staff amounted to deliberate indifference to Carmignani's constitutional rights.

### 4.    Ad Hoc Repeal of Wakeup Requirement

Plaintiffs also challenge the ad hoc repeal of the jail's policy requiring graveyard shift pod deputies to ensure that prisoners are awake with the bed made by 6 a.m.  Opp'n at 10-11.  As described above, it is Plaintiffs' burden to establish "that the injury would have been avoided" had proper policies been implemented.  *Gibson*, 290 F.3d at 1196 (citation omitted).  Here, presumably, Plaintiffs' contention is that had the wakeup requirement been followed, Carmignani's overdose could have been discovered and avoided.  While Plaintiffs have not shown

United States District Court
Northern District of California

1    that the mere failure to allow inmates to sleep past 6 a.m. is itself evidence of deliberate

2    indifference, it may be another piece of evidence of inadequate monitoring as discussed above.

3              5.        Transfer and Detoxification/Overdose Protocols

4              Finally, Plaintiffs contend that the County was deliberately indifferent for its "failure to

5    have an adequate policy and procedure on the identification of an inmate who is experiencing an

6    overdose, . . . a transfer policy and procedure when an inmate encounters problems during

7    detoxification, . . . [or] a written opiate detoxification protocol."  Opp'n at 11.

8              In support, Plaintiffs rely on Nurse Fetterly's testimony that she either was unaware of, or

9    could not remember, any specific policies or procedures on identifying inmates who may be

10   overdosing, what to do if a nurse suspects an inmate is overdosing, putting inmates into an opiate

11   detox protocol, and transferring inmates when they encounters problems during detoxification.

12   *See* Opp'n at 11 (citing CSF ¶¶ 95, 99, 100, 110, 114, 115); *see also* Defendants' responses to

13   related CSF paragraphs.  Plaintiffs also provided the declaration of their expert, Nurse Terry

14   Fillman, who reviewed the County of Marin's Standardized Procedures for Registered Nurses as

15   to opiate and benzodiazepine withdrawal and alcohol withdrawal.  Fillman Decl. ¶ 6, Dkt. No.

16   131-8.  Nurse Fillman opines "that the policies and procedures that existed at the Marin County

17   Jail in July of 2011 . . . were inadequate insofar as they did not clearly set forth procedures and

18   symptoms necessitating immediate transfer to a hospital or other medical facility."  *Id.* at ¶ 25.

19   According to Nurse Fillman, "[i]f there were adequate written policies in place, Mr. Carmignani

20   would not have been placed in a situation where no one was actively monitoring and/or actively

21   observing him.  Stated differently, since the 'observation' policy and procedure is unwritten, there

22   is no specific procedure in place that provides guidance to staff as to how to transfer a patient like

23   Mr. Carmignani to an appropriate medical facility if the opiate detoxification process encounters

24   medical complication(s)."  *Id.*  Nurse Fillman also opines that the Jail provides "no guidance . . .

25   as to what steps [jail staff] should take when an inmate is to be 'monitored' or 'observed' during

26   'informal' opiate detoxification."  *Id.* at ¶ 26.

27             Having reviewed Plaintiffs' statement of facts, the corresponding evidence, and related

28   expert declarations, the purported deficiencies Plaintiffs raise above are tenuous.  First, Plaintiffs

United States District Court
Northern District of California

32

1   have not shown specifically what was inadequate about the Jail's policy and procedures on the

2   identification of an inmate who is experiencing overdose.  They do not point to any specific

3   deficiencies in the County's policy, nor do they show how the Jail's policies or procedures on the

4   identification of overdosing inmates make it deliberately indifferent.  As to the Jail's knowledge,

5   there is no evidence that the Jail or its policymakers were on actual or constructive notice that an

6   omission or defect existed in the Jail's policies and procedures related to overdosing inmates that

7   could cause its staff to violate inmates' constitutional rights.  Plaintiffs rely on this single incident

8   to establish the County's deliberate indifference.

9           In *Connick*, the Supreme Court held that a district attorney's office may not be held liable

10  under Section 1983 for failure to train its prosecutors based upon a single *Brady* violation.  131

11  S.Ct. at 1356.  *Connick* reiterated that "'[d]eliberate indifference' is a stringent standard of fault,

12  requiring proof that a municipal actor disregarded a known or obvious consequence of his action."

13  *Id.* at 1360 (citation omitted).  Disregarding "a known or obvious consequence" means "city

14  policymakers are on actual or constructive notice that a particular omission in their training

15  program causes city employees to violate citizens' constitutional rights[.]" *Id.*  While *Connick*

16  reaffirmed the alternative "single-incident" theory of liability, i.e., that a particular "showing of

17  'obviousness' can substitute for the pattern of violations ordinarily necessary to establish

18  municipal culpability[,]" it also reemphasized that the single-incident theory is possible only "in a

19  narrow range of circumstances" where "the unconstitutional consequences of failing to train" must

20  be "patently obvious" before a municipality can be liable under Section 1983 without proof of a

21  pre-existing pattern of violations.  *Id.* at 1361.  Applying those principles, *Connick* rejected

22  municipal liability in that case, reasoning that the risk that a prosecutor would commit a serious

23  *Brady* violation was not "obvious." *Id.* at 1361-62.  Licensed attorneys "are trained in the law and

24  equipped with the tools to interpret and apply legal principles, understand constitutional limits,

25  and exercise legal judgment." *Id.* at 1361.  The single-incident theory did not apply because "[i]n

26  light of this regime of legal training and professional responsibility, recurring constitutional

27  violations are not the 'obvious consequence' of failing to provide prosecutors with formal in-

28  house training about how to obey the law." *Id.* at 1363 (citation omitted).

As in *Connick*, here, there is nothing patently obvious about the County's purported failure to have protocols about how to identify inmates who are overdosing. Unlike the claims related to monitoring and communications of inmates' medical issues where the record shows that the lack of clear policies creates the obvious consequence that the jail staff will not know how to handle the usual and recurring situations at the Jail, Plaintiffs' claims related to the overdose identification procedures are not so obvious. Plaintiffs have not shown how the Jail would know that its medical staff, like the attorneys in *Connick*, were not capable of making reasonable determinations about the circumstances they confronted. In other words, there is nothing about the facts of this case that show that the highly predictable consequence of not having the specific protocols about how to identify an overdosing inmate would mean that the medical staff, with their training and expertise, would not otherwise be able to make a determination about whether the inmate was overdosing. Thus, under *Connick*, the single-incident theory of liability is inappropriate on this claim.

Second, as to Plaintiffs' assertion that the County lacked a transfer policy and procedure when an inmate encounters problems during detoxification, Plaintiffs fail to develop this theory to describe what is unclear about the procedures for transfer or what symptoms should necessitate transfer but did not under the Jail's policy at the time. It is fundamentally unclear what policies or procedures both Plaintiffs and Nurse Fillman are referring to in their analysis. For instance, are Plaintiffs saying the Jail does not have a policy to transfer seriously ill inmates to a hospital? Or are they saying that the policy exists, but it is inadequate because the policy does not address a usual or recurring situation with which the Jail and its staff must deal? Plaintiffs have not provided evidence to show that the County disregarded a known or obvious consequence of its action. Plaintiffs, therefore, have not raised facts that would demonstrate that the County was deliberately indifferent. Even if they had, it is not clear Plaintiffs could overcome *Connick*'s hurdles related to obviousness of the alleged risk.

Third, Plaintiffs accuse the County of not having a written opiate detoxification protocol. As with the first claim in this section, there is nothing in the record that suggests the County was on actual or constructive notice that a particular omission of a written opiate detoxification

protocol causes Jail staff to violate inmates' constitutional rights.  This case is the only incident Plaintiffs provided as evidence that such an omission might result in constitutional violations.  There is nothing else in the record suggesting that the obvious consequence of failing to have a written opiate detoxification protocol would make constitutional violations likely.  Again, under *Connick*, the single-incident theory of liability is inappropriate on this claim.

        5.     <u>Summary of Municipal Liability Claims</u>

In light of the foregoing, a reasonable jury could find that the County's policies and practices, and lack thereof, relating to monitoring and communications about inmates' medical concerns, were the moving force behind the violation of Carmignani's constitutional rights.  Accordingly, summary judgment is **DENIED** on these claims.  However, with regard to Plaintiffs' claims for failure to have adequate policies and procedures regarding (1) identifying overdosing inmates; (2) a transfer policy and procedure, and (3) a written opiate detoxification protocol, Defendants' summary judgment motion is **GRANTED**.

**D.     California Government Code Section 845.6 Claim**

Defendants also move for summary judgment on Plaintiffs' fourth cause of action against Deputies Johnson, McCloskey, and Hammer, as well as Marin County, under California Government Code section 845.6.  Section 845.6 provides that generally neither a public entity nor a public employee is liable for injury resulting from "the failure of [a public] employee to furnish or obtain medical care for a prisoner in his custody."  Cal. Gov. Code § 845.6.  The statute, however, provides an exception "if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care."  *Id.*  California courts have narrowly interpreted section 845.6 to create limited liability when: (1) the public employee 'knows or has reason to know of the need,' (2) of 'immediate medical care,' and (3) 'fails to take reasonable action to summon such medical care.'"  *Castaneda v. Dep't of Corrs. & Rehab.*, 212 Cal. App. 4th 1051, 1070 (2013), *review denied* (May 1, 2013).  "[S]ection 845.6 creates out of the general immunity a limited cause of action against a public entity for its employees' failure to *summon* immediate medical care only. . . . The statute does not create liability of the public entity for malpractice in furnishing or obtaining that medical care."

United States District Court
Northern District of California

1    *Id.* (emphasis in original).

2         Summary judgment is appropriate on Plaintiffs' claim against Deputies Johnson and

3    McCloskey.  "Liability under section 845.6 is limited to serious and obvious medical conditions

4    requiring immediate care."  *Watson v. State*, 21 Cal. App. 4th 836, 841 (1993) (citations omitted).

5    It does not impose a duty to monitor the quality of care provided.  *Id.* at 843.  Thus, public

6    entities' and public employees' "duty to provide medical care to prisoners is limited to '. . . cases

7    where there is *actual or constructive knowledge* that the prisoner is in need of *immediate* medical

8    care.'"  *Lucas v. Cnty. of Los Angeles*, 47 Cal. App. 4th 277, 288 (1996) (emphasis in original)

9    (quoting *Watson*, 21 Cal. App. 4th at 841).  Here, there is no evidence Deputies Johnson and

10   McCloskey knew or had reason to know that Carmignani was in need of immediate medical care.

11   While Deputy Johnson may have had knowledge of Carmignani's drug ingestion, there is no

12   evidence that he understood that Carmignani at any point had an immediate need for medical care.

13   Deputy Johnson could have provided additional monitoring, but this does not alone create liability

14   under section 845.6.  *See Castaneda*, 212 Cal. App. 4th at 1074 ("California courts hold the failure

15   . . . to monitor the progress of an inmate that the public employee has been summoned to assist,

16   are issues relating to the manner in which medical care is *provided,* and do not subject the State to

17   liability under section 845.6 for failure to *summon*." (emphasis in original)).  Plaintiffs have

18   provided very little argument or evidence to oppose Defendants' motion on this claim.

19   Defendants' motion on Plaintiffs' section 845.6 claim against Deputies Johnson and McCloskey is

20   therefore **GRANTED**.

21        As for Deputy Hammer, there is at least a triable issue of fact as to whether she knew or

22   had reason to know that Carmignani had an *immediate* medical need.  Other deputies in Deputy

23   Hammer's position were trained to take an inmate's failure to respond as an indication of a serious

24   and potentially immediate medical need.  Trustee Diaz's testimony also suggests that

25   Carmignani's appearance at the time indicated an immediate medical need.  Deputy Hammer took

26   no action to summon medical help or to inform her fellow deputies that Carmignani would not

27   wake despite her yelling and hard knocking at his door.  Instead, Deputy Hammer told Deputy

28   Johnson that Carmignani had "refused" his breakfast.  A reasonable jury could find that Deputy

United States District Court
Northern District of California

36

1    Hammer knew of or should have known of Carmignani's immediate medical need and then failed

2    to summon medical care.  Should a jury find Deputy Hammer failed to summon care for

3    Carmignani's immediate medical need, section 845.6 permits liability against the County as well

4    for its employee's actions.  *See Castaneda*, 212 Cal. App. 4th at 1070.  Accordingly, summary

5    judgment on Plaintiffs' section 845.6 claim against Deputy Hammer and the County is **DENIED**.

6    **E.    Plaintiff Frary's Wrongful Death Claim and Survival Action**

7         **1.    Wrongful Death Claim (Count Five)**

8         Defendants contend that Plaintiff Frary lacks standing to bring Count Five of the

9    Complaint, a claim for wrongful death based on negligence.  Mot. at 20.  "In California, an action

10   for wrongful death is governed solely by statute, and the right to bring such an action is limited to

11   those persons identified therein."  *Scott v. Thompson*, 184 Cal. App. 4th 1506, 1510 (2010), *as*

12   *modified on denial of reh'g* (June 25, 2010).  Specifically, standing to sue for wrongful death is

13   governed by California Code of Civil Procedure section 377.60, which authorizes causes of action

14   "to be brought by decedent's personal representative 'or' any of a defined list of persons that

15   includes a decedent's spouse, children, or heirs."  *Moreland v. Las Vegas Metro. Police Dep't*, 159

16   F.3d 365, 370 (9th Cir. 1998), *as amended* (Nov. 24, 1998) (citing Cal. Civ. Proc. Code §

17   377.60(a)).  Where a decedent leaves issue, "his parents would not be his heirs at all and therefore

18   not entitled to maintain [a wrongful death] action at all."  *Chavez v. Carpenter*, 91 Cal. App. 4th

19   1433, 1440 (2001) (citations omitted).

20        There is an exception: "Regardless of their status as heirs, parents may sue for the

21   wrongful death of their child 'if they were dependent on the decedent.'"  *Id.* at 1445 (quoting Cal.

22   Civ. Proc. Code § 377.60(b)); *see also Foster v. City of Fresno*, 392 F. Supp. 2d 1140, 1146 (E.D.

23   Cal. 2005).  "'Dependence' refers to financial rather than emotional dependency . . . [and] a parent

24   'must show that they were actually dependent, to some extent, upon the decedent for the

25   necessaries of life.'"  *Foster*, 392 F. Supp. 2d at 1146; *Chavez*, 91 Cal. App. 4th at 1445

26   ("Financial dependency should be the test for parents who are not heirs of the decedent.").

27   Accordingly, under section 377.60, a "parent may only assert a wrongful death claim if there are

28   no children or issue or if . . . she is 'dependent on the decedent.'"  *Id.* at 1146 (granting summary

United States District Court
Northern District of California

37

United States District Court
Northern District of California

1    judgment where parents offered no evidence they were financially dependent on decedent).

2              Defendants argue that because Carmignani left issue—his daughter, Amaya—and as Frary

3    testified that she is not claiming any loss of financial support from her son (Frary Dep. 25:25-

4    26:6), Frary is not entitled to bring her wrongful death claim for negligence.  Mot. at 22.

5    Plaintiffs, however, assert that Frary can bring negligence claims on behalf of Carmignani's estate

6    as Carmignani's "personal representative" under section 377.60.[8]  Frary maintains that because the

7    Alameda County Superior Court appointed her as the Administrator of Carmignani's estate, she is

8    the personal representative of the estate under section 377.60.  Opp'n at 20 (citing Dkt. No. 131-9

9    (Request for Judicial Notice); *see also* Cal. Prob. Code § 58(a) ("Personal representative" means .

10   . . administrator").  Defendants assert that Frary's claims fail because (1) Plaintiffs' Complaint

11   failed to specify that Frary brought wrongful death and survival claims as the Administrator of

12   Carmignani's estate; and (2) Frary cannot represent the estate for wrongful death when the heirs

13   are already in the case representing themselves in the suit for wrongful death.  Reply at 13.  As to

14   Defendants' first argument, while Plaintiffs' Second Amended Complaint is not the model of

15   clarity, it adequately names and identifies Frary as the administrator of Carmignani's estate.  *See*

16   Second Am. Compl. ¶¶ 1, 16.  Defendants' second argument about whether Frary may represent

17   the estate as Carmignani's personal representative is somewhat more complex.

18             "As a 'personal representative' of the deceased, plaintiff may maintain the action on behalf

19   of the heirs—i.e. as 'a statutory trustee to recover damages for the benefit of the heirs.'"  *Adams v.*

20   *Superior Court*, 196 Cal. App. 4th 71, 77 (2011) (citations omitted).  "[I]t has long been

21   established that [the personal representative] acts as a statutory trustee for the heirs, and that if

22   there be no heir, there is no right of action in the personal representative."  *Cal. State Auto Ass'n.*

23   *v. Jacobson*, 24 Cal. App. 3d 850, 852-53 (1972).  Thus, as Defendants point out, a wrongful death

---

24   [8] In a footnote, Plaintiffs also argue that Frary should be able to recover as any other heir would
     under the wrongful death claim, not because of dependency, but because "[s]tate law damages
25   rules cannot be applied by a court in a Section 1983 action when to do so would be 'inconsistent
     with the Constitution and laws of the United States.'"  Opp'n at 21 n.2 (citing *Cotton ex rel.*
26   *McClure v. City of Eureka, Cal.*, 860 F. Supp. 2d 999, 1011 (N.D. Cal. 2012)).  While this case
     includes Section 1983 claims, those claims are not the subjects of Defendants' standing challenge;
27   rather, Defendants' current challenge is to Count Five of Plaintiff's Complaint, which asserts a
     state law wrongful death claim on *negligence* grounds—not constitutional grounds.  *See* Second
28   Am. Compl. at 23-26; *see also* Mot. at 20.

1    claim may be asserted by either (a) the decedent's personal representative on behalf of the heirs, or

2    (b) the specified heirs (either as plaintiffs or joined defendants)—but it may not be asserted by

3    both.  *See Adams*, 196 Cal. App. 4th at 77 (citing *Scott*, 184 Cal. App. 4th at 1511; *Gordon v.*

4    *Reynolds*, 187 Cal. App. 2d 472, 474 (1960) ("Either the administratrix or the heirs, but not both,

5    may sue, and if the administratrix sues, the heirs may not.")).   Defendants also argue that where

6    an estate's personal representative maintains a wrongful death action, that representative is a

7    fiduciary of the heirs, and should remain neutral when the heirs have conflicting claims.  *Id.* at 78

8    (citations omitted).  Defendants contend that even if Frary is the estate's "personal representative,"

9    Frary has not remained neutral when the heirs have conflicting claims.  *See* Dkt. No. 108

10   (disputing the proposed distribution of the settlement with City Defendants).

11         This case is somewhat unusual because despite Defendants' challenge to Frary's neutrality,

12   all Plaintiffs joined Plaintiff Frary and Ball's Opposition, which asserts that Frary is the proper

13   personal representative of Carmignani's estate.  Additionally, despite the Plaintiffs' dispute over

14   the settlement proceeds from the City Defendants, none of the Plaintiffs have objected to Plaintiff

15   Frary remaining as the personal representative of Carmignani's estate.  Finally, while

16   Carmignani's heirs are represented in this case, both the wrongful death claim for negligence

17   (Count Five) and the survival action for negligence (Count Six) are brought solely by Plaintiff

18   Frary, not Carmignani's heirs.

19         The Court takes judicial notice of the Alameda Superior Court's order appointing Frary as

20   the administrator of Carmignani's estate.  Dkt. No. 131-9.  Defendants did not object to taking

21   judicial notice of this document, and under Federal Rule of Evidence 201, the Court can judicially

22   notice "[o]fficial acts of the . . . judicial departments of the United States," which are "capable of

23   accurate and ready determination by resort to sources whose accuracy cannot reasonably be

24   questioned."  *See also Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir.

25   2006) ("We may take judicial notice of court filings and other matters of public record").  The

26   Court thus finds that Frary is the personal representative of Carmignani's estate as appointed by

27   the Alameda County Superior Court.  *See also Mathews v. City of Oakland Police Dep't*, 2013

28   WL 6057689, at *9 (N.D. Cal. Nov. 14, 2013) (finding that plaintiff had standing where the

United States District Court
Northern District of California

Alameda Superior Court granted plaintiff's petition to become decedent's personal representative); *Hassanati v. Int'l Lease Fin. Corp.*, 2014 WL 5032354, at *16 (C.D. Cal. Feb. 18, 2014) ("[A] personal representative is by definition a court-appointed executor or administrator of an estate, not merely an heir, . . . and . . . a personal representative must be a person empowered by law to administer the decedent's estate.").

However, under California law, given that the heirs are already represented in this suit in related wrongful death claims, the Court finds that Carmignani's heirs are more appropriate representatives of this claim. *See Adams*, 196 Cal. App. 4th at 77; *Scott*, 184 Cal. App. 4th at 1511; *Gordon*, 187 Cal. App. 2d at 474. Defendants agree that "Plaintiff Frary cannot be the administrator for Decedent's estate for wrongful death when the heirs are already in the case representing themselves in the suit for wrongful death" (Reply at 13), but, as noted above, Count Five is currently brought only by Plaintiff Frary, not Carmignani's heirs. *See* Second Am. Compl. at 23. Accordingly, summary judgment on this claim is **GRANTED**; however, Plaintiffs are granted leave to amend their Complaint to name Carmignani's heirs as Plaintiffs on Count Five of the Complaint, the wrongful death claim based on negligence.

2.    Survival Action (Count Six)

Frary also seeks to represent Carmignani's estate in a survival action for negligence. Under California law, "a survivor cause of action is not a new cause of action that vests in the heirs on the death of the decedent. It is instead a separate and distinct cause of action which belonged to the decedent but, by statute, survives that event." *Quiroz v. Seventh Ave. Ctr.*, 140 Cal. App. 4th 1256, 1264 (2006). Section 377.30 governs the surviving cause of action:

> A cause of action that survives the death of the person entitled to commence an action or proceeding passes to the decedent's successor in interest, subject to Chapter 1 (commencing with Section 7000) of Part 1 of Division 7 of the Probate Code, and an action may be commenced by the decedent's personal representative or, if none, by the decedent's successor in interest.

Cal. Civ. Proc. Code § 377.30. Here, Plaintiff Frary has established that she is Carmignani's personal representative, and as such she has capacity to sue on the Estate's behalf; however, Defendants argue that Frary needed to file a special affidavit to pursue this claim. *See id.* § 377.32

40

1   ("The person who seeks to commence an action or proceeding . . . as the decedent's successor in

2   interest under this article, shall execute and file an affidavit").

3      Frary did not submit this affidavit, but this does not mean that she may not proceed with

4   the claim.  *See Parsons v. Tickner*, 31 Cal. App. 4th 1513, 1523-24 (1995) ("Literally, [section

5   377.24] does not require that the affidavit be filed as a condition precedent to commencing or

6   continuing the action.");  *Deirmenjian v. Deutsche Bank, A.G.*, 2006 WL 4749756, at *31 n.157

7   (C.D. Cal. Sept. 25, 2006) ("California law does not require that an heir file an affidavit under §

8   377.32 . . .  as [a] condition[] precedent to commencing . . . an action."); *Gutierrez v. City of

9   Woodland*, 2012 WL 1640509, at *6 (E.D. Cal. May 9, 2012) ("Section 377.32 does not indicate

10   that it is a condition precedent to filing the lawsuit . . . only that the affidavit must be filed at some

11   point.").  Thus, in an abundance of caution, the Court orders Frary to file a declaration that she has

12   the capacity to proceed on behalf of Carmignani's Estate in accordance with Cal. Civ. Proc. Code

13   § 377.32.  *See Estate of Burkhart v. United States*, 2008 WL 4067429, at *11 (N.D. Cal. Aug. 26,

14   2008) (ordering same).  Summary judgment is thus **DENIED WITHOUT PREJUDICE** on

15   Count Six, Plaintiff Frary's survival action based on negligence, subject to reconsideration if

16   Plaintiff Frary does not file the required declaration within 30 days of this Order.[9]

### V.  CONCLUSION

18      Taking the facts in the light most favorable to the Plaintiffs, the Court finds that there

19   remain genuine disputes of material fact as to whether the Jail and its staff acted with deliberate

20   indifference to Anthony Carmignani's medical needs while he was in their custody.

21      Based on the analysis above, the Court **ORDERS** as follows:

22     (1) Defendants' Motion for Summary Judgment as to Plaintiffs' Section 1983 claims

23        against Deputies Johnson and Hammer, Nurse Fetterly, and Sheriff Doyle is **DENIED**,

24        but **GRANTED** as to Deputy McCloskey.

25     (2) Defendants' Motion for Summary Judgment as to Plaintiffs' Section 1983 claims

---

[9] Defendants raised an argument on reply about Plaintiffs' negligence claims.  The Court will not address that argument as Defendants failed to raise them in their opening motion, and Plaintiffs did not have any opportunity to respond.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

United States District Court
Northern District of California

against the County of Marin is **GRANTED IN PART** and **DENIED IN PART**. Defendants' Motion is **GRANTED** as to Plaintiffs' claims against the County for failing to have or failing to have adequately transfer procedures, opiate detoxification protocols, and procedures to identify inmates who are overdosing.  Defendants' Motion is **DENIED** as to Plaintiffs' claims against the County for failure to monitor and failure to have policies and procedures about how to monitor inmates and communicate information about inmates' medical needs.

(3) Defendants' Motion for Summary Judgment as to Plaintiffs' section 845.6 claims against Deputy Hammer and the County is **DENIED**, but **GRANTED** as to Deputies McCloskey and Johnson.

(4) Defendants' Motion for Summary Judgment as to Plaintiff Frary's wrongful death claim (Count Five) is **GRANTED WITHOUT PREJUDICE**, but **DENIED** as to her survival claim (Count Six).  Plaintiff Frary must file the requisite affidavit as described herein within 30 days of this Order to maintain the survival claim.

(5) Plaintiffs may amend their Complaint by April 1, 2015 to (1) name Nurse Fetterly as a defendant in Plaintiffs' first cause of action, and (2) to name Carmignani's heirs as the representatives on Count Five, Wrongful Death Based on Negligence.

**IT IS SO ORDERED.**

Dated: February 25, 2015

_____
MARIA-ELENA JAMES
United States Magistrate Judge